We have before us the in-ray application of Chevron Corporation, at all numbers 10-4699 and 11-1099. Just a note at the outset that the two things, one, KSEC, so I won't forget at the end, we get together and order a transcript after this hearing and to apportion the costs among the parties. So if there's, for anybody who argues today, consider you to be one party that's arguing. So in connection with the defendant, consider them just to be one together instead of two. The second thing is, when we appeared on, you appeared before us on January 5th, there was, we had no time. Today we do have time constraints, so we're going to keep to them at least loosely, and so this is not going to go on like it did the last time, close, well we went on close to two hours, but we were trying to get a lay of the land. So today, be more pointed in your comments. So we'll begin, I guess, with Mr. Terrell. Actually, Your Honor, my name is Gene Shearer, I'm not in the public, that's right, I'm not and he and I have agreed that I would go first, and I believe he'll probably take the bulk of our time. That's fine, sir. And I'd like to reserve four minutes of my time for rebuttal. And that's fine as well. Thank you. For the Republic, this case is about far more than a few privileged documents. It's really about whether the Republic's U.S. lawyers can be denied the protection of a well-established legal doctrine to protect communications with lawyers for the Ecuadorian plaintiffs who have a common interest in fending off various maneuvers by Chevron outside of Ecuador that are designed to force the Republic. So you're saying, what, there's a community of interest here? Yes. And is, which law do we apply, is it Pennsylvania law? No, we believe it's federal common law, but we don't think the court actually has to reach that question because the principal open question in this area of law is whether the interest, the legal interest, has to be exactly symmetrical or congruent or whether a substantial similarity is enough. And we don't think the court has to decide that question here. Because? Well, you can. Well, the principal issue in the case with respect to the common interest doctrine is not so much the degree of congruence that there must be between the parties, but it's at a more basic level. That is, do the, the other side's argument is based on a basic confusion between legal interests and a party's ultimate objectives. In our brief, we talked about an example of the Divorcee litigating along with the IRS a question of how much taxable income her husband had made during a particular year. The two parties' objectives in that circumstance are obviously very different, but they share a common legal interest in the question of how much taxable interest, taxable income, the husband had. So we... As far as this matters, does it, if we think that the court should not have required the plaintiff to talk to us? That's correct, Your Honor. And, and... That's the first issue. That's right. And we, we, we agree with the plaintiff on that issue. And so the issue with respect to the Republic is only important to the extent the court believes that there may have been a waiver. And we believe that even if there had been a waiver, if the common interest doctrine applies, the waiver could not destroy the Republic's own privileges and the communications at issue here. Because... What's, what's the extent of the work product privilege that you're alleging here? You mean the number of documents that are issued? Yes. I mean, is that anywhere in the record as to what it is that you're asserting the work product privilege to? I don't know that it's in the record. I do know that just before the district court issued its decision, we had offered to give the court a privilege log that would identify the specific documents as to which we claimed the public... And, and Judge DuBois said what? I'm sorry? He said what? He would, no need to do that? That's correct. He... Because, because there was, he found there was a waiver. That's correct. Without the... So if there was such a log that was available? There, there is a log that would have been available, yes. And, and I can represent to the court that it's a, that it's quite a small number of documents that are at issue. It's no more than, no more than a hundred documents, but probably far fewer than that given the way the district court ultimately narrowed the scope of the case. When you say issue, do you mean an issue to what you're claiming a common, a common interest in? That's correct, yes. Or an issue as to the whole argument on what has to be produced? Otherwise, you're telling us that most of the documents would be produced without objection? Our objective, our objection under the common interest doctrine would only extend to at least a third of the documents that were, that appeared on Mr. Cone's privilege log. Okay, but that wouldn't mean that the Ecuadorian plans wouldn't have an interest in other documents doctrine. No, that's correct, Your Honor. I'm just talking about the Republican's own, the Republic's own interest under the common interest doctrine. Would these be communications between counsel for the Republic of Ecuador and Mr. Cone and vice versa? One to the other, either way? Typically not between the Republic's lawyers and Mr. Cone, but typically between them and other members of the plaintiff's team. All right, well, are those the kind of documents that Chevron at all are even seeking from Mr. Cone? A few of them are within the scope of the subpoena, a few. A few? Of the 100 documents, how many of those relate to communications by you or counsel for the Republic of Ecuador and Cone in some way? All of them relate to communications with Cone in some way, either directly or indirectly. Okay. By indirectly, you mean Cone was one of the counsel for the plaintiffs? Yes, as part of a team. As part of a team, okay. So you're saying that any communication with any member of the team, there's a community of interest you assert, and that community of interest cannot be waived as to you unless you consent to it. That's correct, and that's what this court said in Teleglobe. Actually, Teleglobe is... I've got it. It's essentially dicta or dictum, and they're talking about the Delaware courts seem not to have taken a position on whether the common legal interest must be identical, and we need not resolve the congruence of legal interest question here. So, in fact, we're saying we're not resolving it. For our purposes, I go on in writing this, it's sufficient to recognize that members of the community of interest must share at least a substantially similar legal interest. So we didn't decide it. Judge Fisher and I were on that panel. That issue was not decided there, and also it was a relation to what would Delaware law be on this. Correct. In the case that we're talking about, it seems as if in the restatement, we're leaving the plan case where it says you have to have identical interest to something that's substantially similar. It doesn't have to be identical in order to claim a community of interest. I agree, Your Honor. Teleglobe left that issue open, but again, our fundamental problem with what the district court did here is it was not so much a matter of the degree of congruence that must exist among the parties. It was a simple confusion between ultimate objectives, what you might call business objectives on the one hand, and legal interest on the other, and the other side defends the district court's decision only on the basis of a confusion between those two basic concepts. That is, they say that because the ultimate objectives of the Republic and the Ecuadorian plaintiffs are not exactly aligned, regardless of their interest in particular legal issues or mixed questions of law and facts that may arise in the litigation, they say that because the ultimate objectives are not aligned, that destroys the community of interest, and we think that's just incorrect. And because that's the only defense being offered for the district court's decision here, we believe that the decision needs to be reversed. Now, you don't think that the interest should be identical, I take it? That's correct, Your Honor, but again, we don't think the court, we think we would win under either standard. Under any test you think you would. That's right, because if you look at specific legal questions or mixed questions of fact and law as to which we have a community of interest, our interests are in fact identical to those of the plaintiffs. Thank you. By the way, what would those interests be? Well, we identified three, at least three in our brief. Probably the most important legal interest is our shared common legal interest in establishing that Chevron does not have a legal right under the bilateral investment treaty between the United States and Ecuador. To have the arbitration? I'm sorry? To have the arbitration? Well, to have the arbitration carried on in a way that could interfere with the plaintiff's litigation in Ecuador. And we have, although our reasons for believing in that position and asserting that position are different, we have an identical legal interest in establishing that the international arbitration... Yeah, I mean, I would assume if it's perceived or viewed or decided that you must participate in that arbitration pursuant to treaty, not doing so would somehow put you in violation of international law. That's correct. And when the arbitration was first filed was when, 2003? The first arbitration was filed in 2004. That was a AAA arbitration here in the U.S. And then there have been two subsequent arbitrations. The one that's ongoing now in the Hague under the bilateral investment treaty is the third. And have you, from the outset, claimed that you were not a party to that arbitration and you will not be a party to the arbitration? We've claimed that we were not a proper party. We have to appear and defend ourselves, obviously. Okay. Thank you. I'll reserve the balance of my time. Mr. Terrell? May it please the Court, James Terrell of Captain Boggs for the Lago Agria Plaintiffs. As Your Honor is aware, this is a fast-moving global litigation, and so before I turn to the specific issues, it might be useful to take a moment of my time to tell you what's happened since I appeared before you last. Significant... Yeah, we've been reading about some things in the paper, so go ahead.  You actually anticipated one of my questions. On February 1, Chevron filed a civil RICO action in the Southern District of New York against all 47 indigenous people from Ecuador, all of their attorneys, their spokespeople, everyone. On February the 3rd, Judge Kaplan entered a temporary... Let me ask you a question on that. Was Mr. Cohn named as a defendant? He was named as an unnamed co-conspirator, along with my firm, Captain Boggs. On February the 3rd, Judge Kaplan signed an order to show cause, seeking a TRO that called for a global injunction against all acts by the Ecuadorian plaintiffs to enforce a judgment of an Ecuadorian court anywhere in the world. Has the TRO expired, however, has it not? No, it has not. It was extended. It was extended by Judge Kaplan to March 8th for the maximum permitted 28 days. He did that to a sponte. He ordered that that be served by email on one of the lawyers for the plaintiffs in Ecuador. They were then given three days, including Saturday and Sunday, to respond to the TRO. So there's a PI hearing set up on March 8th, is that right? A PI hearing on March 8th is the expiration of the TRO. The court has already heard argument last Friday on the PI hearing. But first it heard argument on the preliminary, on the TRO, and gave Saturday, Sunday, and one extra day for the people who got served by email in Ecuador to respond. You can see where I'm going with this. At that point, he entered the TRO, the most global TRO I have ever seen, enjoining everyone, including lawyers, assisting with legal advice on judgment enforcement from providing any legal advice to these people. That injunction, that TRO remains in effect. Can we hear this case? I wish you could, Your Honor. I really wish you could. I just wonder whether we're enjoined. No. Your Honor, I will not comment on that. I'm afraid I may be. I'm trying very hard not to be. Well, I was walking out the door today. First of all, on the way out the door, my secretary handed me your letter from yesterday. By the time we got to the elevator, she actually had a cell phone call saying a 171-page document was coming home. What was that? I really don't know, Your Honor. I can't keep up with it. You didn't send it in. We didn't send it in that I know of. Maybe it's the opinion, which we've been trying to get translated. So I'm jumping ahead to February 14. So last Friday, preliminary injunction hearing. No decision yet. And the issue is global injunction against anybody enforcing the judgment on a case that they asked to go to Ecuador anywhere. Okay? So we're waiting for the preliminary injunction. Why don't you judge the voice? Ordinarily, if somebody said to a judge, well, we want everything in this lawyer's files to represent these people, the judge would say, well, you can't have that. So what was it that was the basis for doing that? Urgency. No, no. What's the substantive basis for getting around the fact that usually you can't look at a lawyer's file? The substantive basis, which I of course disagree with, is that Mr. Cohen appeared in a few outtakes from the documentary crew. But the outtakes themselves were not a waiver of any privilege. Precisely. And the outtakes were not put forward by the plaintiffs. Chevron fought to get those outtakes in litigation in New York, got them, and then posted them on the website. So we have the peculiar situation of they now claim prejudice from outtakes that were never intended to be shown by the plaintiffs from their own publishing, that on their own website. But don't you have to look at what the purpose of the disclosure was that was depicted in the outtakes? Which would seem to be to gain an advantage in litigation. And that's one of the keys. No, let's assume it was to gain an advantage, but it was in the world of public relations. And my first argument, which you segmated me into, except I didn't tell you that on the 14th of February, a $9 billion judgment was entered by the Ecuadorian court against Chevron in a, I suggest, well-reasoned 187-page opinion, which rejected their arguments that there was any fraud that the court could find there under the controlling Ecuadorian law, rejected consideration of the Cabrera report, said, I'm going to grant them their relief and not look at it, rejected consideration of the Comback report. So all of the things that they've complained about that constituted the fraud, the court said, I'm aware of it. I don't consider it a fraud. But to be fair, I'm going to not look at those things in any event. Let's go back to Judge Fisher's question later. It seemed to me, in reading Judge Du Bois' opinion, that he perceived that the making of the film, Crude, and the outtakes that related to that were for the ostensible purpose of gaining an advantage in litigation. And as a result, he believed that there was a waiver of privilege, so much so that he believed that he did not even need to do a fairness and balancing test. You're correct. And what he failed to understand is this was never submitted to the Ecuadorian court. And the touchstone in, I suggest, this circuit, certainly in the First and Second Circuits, and I think here in the Westinghouse cases, if you have not affected the truth-gathering process, you've not submitted it to the court, and there is no evidence here, certainly we never submitted it to the court, that anything has affected the truth-gathering process in Ecuador, you can't simply go to subject matter waiver, which this court jumped in. But don't they argue, and isn't there some support for that argument, that you were seeking an unfair advantage by having the documentary produced? You're trying to bring world pressure on Chevron to come to the settlement table and to agree to a settlement. They do argue that. And there's nothing wrong in these kinds of cases with bringing pressure to bear on the other side. In fact, they put out their own documentary, two websites in which they say these are the true facts, and innumerable press releases. But at least on this record, you're not claiming any privilege to the documents that they put out in their documentary. And we're not claiming any privilege with respect to what was disclosed in the documentary. Our position is that an extrajudicial disclosure does not trigger subject matter waiver. What they're seeking is 18 years of privileged documents, many of which, 15 years or more of which preceded the crude outtakes, all of which Judge DuBois ordered be produced because he was impressed with the scope of this. Are there things in the listing there, was it 860 items or something? Are there things in there that you think that they are entitled to get? We believe that the only thing that they are entitled to get that has been waived is the actual statements made by lawyers in the movie, and they know exactly what they are. Okay. And that's it. So this is... That would include the outtakes too, wouldn't it? Well, and they now have the outtakes, so it would include the statements made therein. But what about the outtakes that weren't in the movie? No, I... He means that. Those are the outtakes. In other words, there's the movie, and then there's the outtakes. And so you agree that the items that were in the outtakes that were not in the movie, there was a waiver? Well, not a voluntary waiver because a court ordered the production of those outtakes. But yes, I think that they are entitled to use the actual documents or language that was referred to in those outtakes and that there is no privilege as to that. My position is that does not trigger subject matter waiver. They are entitled to what they've got there, but nothing more. To simplify it, on the other 172 documents that they're requesting? It's not... It's thousands of documents. Okay. It's like 800 pages, and it's only a partial, I think, privilege log prepared by Mr. Cohen's counsel. We haven't even seen all of this yet. So they... In effect, what you're saying is that they're not entitled to anything they don't already have. Precisely. So that everything is an issue. So I was interested in this. I once tried a case, and I was representing a public agency, and the mayor and everybody was talking all about the case. And the other side, the citizen, was complaining in court about it. And the judge looked at it like he was crazy. There's no jury. And said, do you think I'm going to decide this case on the paper of newspaper... Basis of newspaper articles? Which was the end of that discussion. That's your position, right? It's our position that what they have to have, and there is no basis since it was never submitted to effect a judgment in Ecuador, to get more. Okay? They can't use it to ratchet it up. If I may, because I'm mindful of time, and I know you've got places to go and things to do, so I will try to be very quick about this. We think that the court erred as a matter of law there. Erred as a matter of law by not holding any fairness hearing. He said he did. Didn't consider that at all. We also think it was an abuse of discretion not to limit the scope of the subpoena. The subpoena, the motion papers said there were two things they needed. The Cabrera reports and the information about the indictment of the criminals and the individuals criminally. But their subpoena is in no way limited to their topics. The same issue as to another counsel, Mr. Bonifaz, was presented to the district court in Massachusetts who, in this litigation, who I suggest handled it appropriately. He said, I'm limiting the scope of the subpoena to the topics that you're interested in. Now, you give me a privilege log for those. You contest what there isn't that's privileged. He resolved it and it was done. There was no subject matter waiver. And Mr. Bonifaz was exactly similarly situated as Mr. Cohen. Look, there's a big opinion here which I never saw from Ecuador, so I have to ask this question. Is there any indication that the Ecuadorian court paid any attention to the movie, Crude, or the outtakes in reaching its result? I believe the answer to that is no. We've been struggling to get a full translation of 187 pages. There is no indication in the opinion that the court saw the movie or the outtakes. It does reference something about outtakes based on what was submitted not by us, but by the other side in rejecting proof, in rejecting that there was a fraud. In translating 180 pages of Spanish, I thought there would be lots of people who could translate that. Yes, it is, Your Honor, and if I had Chevron's money, I could do it as well and as quickly as they, but we've had to deal with much less skilled and quick translators. And so I have a rough translation now, which I got yesterday. One question I'd like to ask if I could. Sure, go ahead. You challenge the scope of the discovery. We do. Do you have standing to challenge the scope of the discovery when Mr. Cohen and his firm have not objected to it? Absolutely, and as you said last time, Judge Fischer, if I recall correctly in January, the privilege belongs to the Lago Agria plaintiffs, not Mr. Cohen. They are the real party in interest. Moreover, I think it's fair to say Mr. Cohen wants to testify here. He wants to turn over the documents for whatever reason. There was a split between Mr. Cohen and the plaintiffs, Mr. Donziger, before I became involved in the case. I think it's quite clear, counsel is here and she'll argue, that Mr. Cohen wants to separate himself from Mr. Donziger. Whether he's cooperating with Chevron or not, I have my suspicions, and I don't know. But the reality is that privilege belongs to my clients. My clients do not want those documents released. The cases we've cited in our brief indicate, I believe, that we clearly have standing to make that point. And it flows from, I think, the question you asked me back in January. At my age, my recollection goes back that well. And so if I can finish and just – Well, I remember I asked it. I just wasn't clear on what your answer was. That's why I asked it again. I hope I answered it the same way. I'm not absolutely positive. We've also made arguments which we ask you to look at. There are issues of first impression, first time coming to the circuit. Does Federal Rule of Civil Procedure 30, which provides only 10 depositions unless you meet the qualifications under 26 to apply for more, apply in the 1782 context? Well, they've been applying one by one, so you can't say they didn't apply for more. Even if there are separate cases, but even if you treat it as one case, they have been applying for more, and judges have ordered it. Actually, there's been no clear application for more. They just get one at a time, and nobody considers it. Well, they're applying for it. Somebody could say, hey, judge, they're up to 12 now. Well, and they're up to 26 and 40 days of deposition. I'm asking this court to decide as a matter of law whether or not, if this case is remanded, whether the district court needs to address that question. It is anomalous in the extreme that an American litigant under the Federal Rules of Civil Procedure is limited by Rule 30, but international litigants who come in here under the guise of 1782 can ask 17 different judges to order one or two depositions each in what is a unitary case. That cannot be the law, should not be the law. My other issue of law that we ask you to decide is, as the Fifth Circuit and I believe the Second Circuit have decided, it would be inappropriate for this arbitration, a private arbitration, to be entitled to 1782 discovery. Is this really a private arbitration? It is a private arbitration. It is by agreement, and the indicia of why it is a private arbitration is fourfold. Number one, it is a creature of contract. Number two, there is not an established panel for this. It is an ad hoc panel. Number three, there is no – as it was very important to the Supreme Court in Intel – no judicial reviewability, which was that key factor in Intel. Now, counsel argues there's review in the courts of the Netherlands. They cite no support for that whatsoever. And in point of fact, if you take a look at all of the relevant rules under – I never get this right – UNCTRAL, UNCTRAL, BIT, or the Permanent Court of Arbitration, there isn't a single reference to any appellate procedure there at all. And lastly, it is not, as was found by other circuits, pre-Intel but reaffirmed by the Fifth Circuit after Intel, it is not a state-sponsored or quasi-adjudicative proceeding. I guess you think we decided the first case won because we have – I think you decided it brilliantly, but that question was not brief and squarely presented to you. It's in there. It's in the opinion. And I think if you look at the factors that I've just outlined and what are in these briefs where there is full opportunity, I am – to review it, I am sure you will give it the same appropriate consideration that you gave the decision coming up from Judge Chesler, who is a longtime friend. But he admits occasionally he makes a mistake. Well, this case here only is the Republic of Ecuador is involved and the arbitration derives from a treaty between the U.S. and Ecuador. And that would seem to be intergovernmental as opposed to private. If you look at the decisions of the two circuits, including the decision after Intel, they had the opportunity to go to a public proceeding to challenge what was happening to them from the Republic of Ecuador. Yeah, well, the Fifth Circuit case involved Kazakhstan. And they elected private arbitration. And so to wrap up, I thank you very much for the time. I hope you'll give me a minute or so in rebuttal. That's good. And thank you again. All right. Thank you very much. Mr. Mastro? Thank you, Your Honors. And I did read the UBR decision, pages 3, 10, and 11, where you squarely addressed this question. And for Mr. Terrell's edification, you appeal under the UNCTRA rules to the courts of the Netherlands. So it's a public proceeding. And, Your Honors, let me come right to the heart of it. Because Mr. Terrell's version of the law would mean that you would never have a waiver, contrary to Westinghouse and Teleglobe. You'd never have a waiver that went beyond exactly what was said in the context of some kind of report. You had decided in Ecuador, at least on the trial level. Yes, Your Honor. Is there any indication at all that anything in the movie itself or the outtakes affected the decision in Ecuador by the judge down there? Your Honor, outtakes were submitted to that court, and not surprisingly... Who submitted them? We did, Your Honor. But the distinction that Mr. Terrell is making is way too narrow in terms of what constitutes extrajudicial and what doesn't. You could publish anything in any newspaper, and I've seen it on any case I ever sat in for 37 years plus as a judge, and I guarantee you nothing in any newspaper or article ever had the slightest bearing on my decision. Here's why, Your Honor. This is not a limited extrajudicial waiver. The following factors. It was an intentional, calculated attempt to influence the litigation and to pressure Chevron into settlement, where the plaintiff's team, the plaintiff's lawyers, not just Mr. Cohen, but their entire plaintiff's lawyer's team, invited cameras for hundreds of hours to actually tape every aspect of the litigation. Their private meetings with their clients to discuss litigation strategy, with their experts to discuss expert reports, and their litigation strategies, their settlement strategies. Every aspect of the litigation was waived. That's why Judge Du Bois found, consistent with Westinghouse, consistent with Teleglobe, on which... Well, consistent with Westinghouse. I mean, I'm not sure what Westinghouse decided. I mean, and when it talks about this stuff, it talks about it in footnotes, right? It says, Your Honor, specifically, that it would be unfair to the party's adversary. It says most courts do... Well, it does say most courts, or generally, courts do a balancing or fairness test. Here, Judge Du Bois decided that, well, some courts say that, and I think he cited Westinghouse. I'm not going to do it. I don't have to do it. He said that, Your Honor. Not that he didn't consider fairness. He said that under these circumstances, with the truly extraordinary scope of the waiver, with, as they've admitted, the tactical litigation strategy to do this, to pressure Chevron and to hurt Chevron in the litigation, that, under those circumstances, that it would affect a sword and shield circumstance. Well, let me read to you... They were waving for purposes of a sword and saying, Oh, but now that I've waved, I want to put up a shield. Let me read to you exactly what Judge Du Bois' words were. Under some circumstances, a party making a very limited intentional disclosure is entitled to a fairness balancing test. So he's equating the two, fairness and balancing, to determine if the waiver extends to the related documents, citing Westinghouse. The court concludes, however, that given the truly exceptional scope of the waiver in this case, the Lago Agrio plaintiffs are not entitled to such a balancing test. That's exactly what I was just trying to reflect, Your Honor. I considered all of these circumstances and concluded that there didn't need to be a fairness balancing hearing separately because it was so obvious under these circumstances what the truly extraordinary scope of the waiver and the calculated decision to pursue this as a litigation strategy, that that wasn't extrajudicial, that that was, in fact, designed to affect... Let me ask you a question here a couple places. Please. I take it that, you know, Judge Du Bois didn't look at all of the outtakes. He looked at the outtakes that you submitted with your 1782 application. That's correct, Your Honor. The same ones that you submitted to us. Correct. On the DVD. Okay. What portion, if you know, what portion of the 600 hours of the outtakes were the outtakes that you submitted to Judge Du Bois? Your Honor, we submitted approximately two dozen outtakes, and the individual defendants submitted another half dozen to a dozen. So they comprised some discrete part of the whole. In those discrete outtakes themselves, they reflected meetings in Mr. Cohen's office discussing the litigation strategy. Yeah, but you didn't answer my question. If you know what percentage, I mean... It was a small percentage. They were a couple hours. Yes, Your Honor, but what happened on those couple of hours was extraordinary. One 300. But, Your Honor, what is reflected on that... I'm not questioning that there may not have been extraordinary, but that was the basis of Judge Du Bois' decision. Those are the outtakes that are in front of us, correct? That's correct, Your Honor, but he was also fully aware that there were literally 500 to 600 hours of total outtakes that the plaintiff's lawyers themselves were the stars of the outtakes. They had solicited the plaintiff. But how do we know that? They allowed them to be... How do we know that? Well, Your Honor... I watched the documentary. The documentary didn't... It was a documentary. Let's put it that way. It was a good documentary. It was well done. There wasn't much in that documentary that was shocking to me, particularly as it related to this case. So, I guess my question is, you're saying there were all these 600 hours. If there was shocking material in those 600 hours, I have to think they would have somehow used it in a documentary because I think Berlinger was working pretty closely with Donziger. You're correct, Your Honor. That's exactly what the Second Circuit found. It wasn't an independent film, but it was done in collusion with the plaintiffs. I'm accepting that. But assuming that he was working pretty closely with Donziger, it seems to me if there were some startling revelations in those other hours, they'd have been in the documentary. But, Your Honor, because it was not an independent film, as the Second Circuit held in ordering the crude outtakes, because it was done, solicited by the plaintiff's lawyers, for the plaintiff's lawyers, with editorial control over what went into the movie, it's not at all surprising that the movie is just the plaintiff's lawyer's perspective. But, Your Honors, let's look at what was in those outtakes, just the clips that you have. You had the court expert, Cabrera, meeting on film with the plaintiff's team two weeks before he was even officially announced as the appointee of the Ecuadorian court. And at that meeting, they were talking about jacking up to $30 billion, his estimate, which it turned out later was almost identical to what his estimate was. You could debate all that. Actually, Your Honor, it's not a matter of debate. You could debate whether or not Cabrera was told to meet with both sides, and your side didn't meet with him. That's part of the record, or it was part of the record in the last case. In the last case, yes. But, Your Honor, nobody was permitted by the Ecuadorian court to be meeting and indoctrinating the court-appointed expert two weeks before he was even appointed, with the appointment having been wired by the plaintiffs with the court. And, Your Honor, it was certainly improper by any standard for the very next day, the plaintiff's lawyers, Donziger, to meet with their key experts, the key experts saying, it was bizarre, weird, that we were meeting with the court-appointed expert before he was even appointed, and then admitting they don't even have the proof of groundwater contamination, but Donziger telling them it's all smoke and mirrors and bull. It seems to me what you're arguing is if you have a case like this, and you go out and you solicit a documentary, and you participate in any of the filming of that documentary, that you've essentially waived the attorney-client privilege. No, Your Honor. What I am saying is, under these circumstances, where the plaintiff's lawyers solicited the film and then gave them such unprecedented access... Under those circumstances. Under those circumstances, Your Honors, if that material then was disclosed as it was, the court ordered that it be disclosed. I think you're missing my point. You certainly are. It doesn't appear to me that the record can pin down that all of this material you're seeking from Mr. Cohn was in fact disclosed during the interviews, which were part of the outtakes which led to the documentary. But, Your Honor, as we read Von Bulow, which Westinghouse cited with approval, and Westinghouse and Teleglo... But you'll admit Von Bulow, the case was over in Von Bulow. That's correct, Your Honor, and that's the distinction. But the Second Circuit made very clear there that if the information disclosed there, that's outside the courtroom, but if the information disclosed there had been, this is their words, a broad waiver would have been warranted, quote, where the privilege holder has attempted to use the privilege as both a sword and a shield. It's not that it has to be disclosed only in the courtroom setting. It's that you use the privilege as a... It's exactly what Your Honor wrote about in Teleglo. It's exactly what was the concern in Von Bulow, and this is a classic case of sword and shield. Donziger, Cohn, and their collaborators all decided that to give 500 to 600 hours of film time to a filmmaker, their most intimate conversations could be used to their advantage because they had a friendly filmmaker who would bow to their editorial control and they'd get their position out there to club Chevron with it in the litigation. But then it comes back to Judge Greenberg's question. Even assuming all of that, was there an unfair advantage taken of the Ecuadorian trial process because it's conceivable they may never have paid any attention to what you came up with under your 1782 discovery here with respect to the outtakes? Absolutely unfair advantage was taken. What was the unfair advantage? What was the unfair advantage to answer Judge Greenberg's question? The intent here was entirely to force Chevron to submit to settlement pressure and to color the proceedings of the court in Ecuador with the adverse... Judge Ambrose is asking you in terms of what the actual litigation result was in Ecuador. What did any of this have to do with that result? In other words, do you think that the judge in Ecuador... I was sort of struck by the fact that this boxcar number was coming in from Cabrera and the verdict came in for about one third of the amount. Everybody was screaming about the Cabrera report. But what evidence is there that anything on any of this filming had anything to do with the outcome? Your Honor, I think the evidence of it is the climate of pressure, fear and intimidation in the courts there was created in part by Donziger's and the plaintiff's team's attempts to pressure the court to get the courts to order a higher settlement. Just one thing, Your Honor. Could you show us in the record where, because they used this crude and the outtakes, evidence that that somehow pressured the court there? Your Honor, Donziger's own words talking about using threats in the outtakes of this litigation, using threats, intimidation, publicity to coerce the Ecuadorian court to realize it has to rule their way or the judges in Ecuador will face adverse consequences. That's all over these outtakes. Could you show us where the Ecuadorian judge cared at all about any of that? I regret the opinion. Is that opinion coming to us? Is that what we got today? To my knowledge, Your Honor, it is not. But we are trying to get you a certified transcription. And let me just say one other thing. It's a very long opinion. Do you have a 171-page document? I do not, Your Honor. But let me please just clarify because the focus here is that you don't have to take my word for it. Donziger's own words on the outtakes, their own words in their own papers that they were trying to achieve a strategic litigation advantage by doing the film. That's the words they used in their own brief in furtherance of tactical litigation strategy. Mr. Terrell's own words the last time we were here that it was to pressure Chevron in terms of the litigation. I understand that they wanted to pressure Chevron. What I'm trying to find out is... To settle the case. What I'm trying to find out is whether any of it made any difference in terms of what a judge ruled in Ecuador. One can hardly expect the judge in Ecuador who's just issued a multibillion-dollar judgment to be acknowledging he was affected in any way by the pressures, threats, and intimidations. That would be extraordinary. Otherwise, he wouldn't have issued the judgment in the first place because he wouldn't have had the courage to say no. Now, Your Honor, let me just say this. The actual judgment that was issued is actually an $18.2 billion judgment because that judgment imposes a penalty on Chevron unless it apologizes within 14 days. So it comes out shockingly close to where Cabrera started which was $17 billion, then jacked up to $27 billion because, as Don Ziger says in the outtakes, we start high, so when he comes in a little lower... The bottom line is that, I don't know if you were around, but somebody chose Ecuador to go from the Southern District to New York and I think it was you guys, right? Well, Your Honor, thank you for asking because what was chosen to go to Ecuador, not by Chevron, by Texaco, what was chosen to go to Ecuador were the limited claims of a few individuals as to their individual damages. That would have been a very small set of claims and that's what was transferred back to Ecuador. Instead, what happened by the time the case got back to Ecuador was, under a new Ecuadorian law, a case for community harm that was unrelated to those few individuals and turned into a multi-billion dollar litigation where these individual plaintiffs became the stalking horses for the Republic of Ecuador's government which had already released Texaco in its succession. Mr. Mastro, one question. Under 1782, do we still have jurisdiction as it relates to your request in light of the decision in the Ecuadorian court last week? Yes, absolutely, Your Honor, for two reasons. First, in connection with the BIT arbitration, all of this discovery is absolutely necessary and relevant. In fact, the BIT tribunal issued its own interim measures order against the Republic of Ecuador and that evidence has been submitted there, considered there, and continues to be considered by that court as it goes beyond the interim measure stage. Second, even in Ecuador, while we think a travesty of justice has occurred, there is an appellate process and then there are two related potential proceedings separate from the immediate appeal where there could still be the opportunity to present evidence. But you're not going to be able to present evidence in that appellate process? Not in the appellate process, but there's two different other alternatives besides the appellate process, which is a one-level appeal. There's something called a cassation recourse and there's also something called in the constitutional court where you can provide additional evidence to show a travesty of justice. If we found that the unit trial arbitration wasn't one of those that fell under 1782, wouldn't it be more appropriate for you to come back at a later time? If we got into a trial proceeding again in Ecuador? Well, Your Honor already settled that question in UBR. All 19 courts in this country that have addressed that question in the context of the Chevron applications and the one who addressed it in the context of their applications, every court that has been asked about the BIT arbitration has concluded that as a foreign tribunal for purposes of 1782, you got it right in UBR. But if I may come back to this more fundamental point because it is so critically important. If you could do it one minute, what is the fundamental point that you actually want to tell us again and again that we have to focus on? I think what you have to focus on is that the key line of cases in this regard says that where it is an intentional, calculated litigation strategy to try and affect the proceedings and their outcome. It doesn't matter whether it was said to cameras that you thought you controlled what content were making in the film or whether it said in the courtroom. There isn't any question on this record and Judge Du Bois did not abuse his discretion in self-finding when they admitted that this was for tactical litigation strategy. But the evidence that you wanted was principally what? You wanted matters relating to the Cabrera report. Is that correct? Your Honor, actually, Judge Du Bois narrowed our requests. He ultimately concluded that we were only entitled to documents from the Lago Agrio litigation. He narrowed it in time and he narrowed it in scope. That would include Cabrera, but he narrowed it temporally. But only as to the Cabrera? Because the two things that I understand, you're looking for matters that relate to the Cabrera report and the defendants are looking for matters that relate to the decision of the Republic of Ecuador to prosecute them, then not prosecute them, then come back and prosecute them again. Is that correct? Yes, Your Honor, but there's other aspects of the Lago Agrio litigation. There's collusion with the government. What are you looking for? What did you come to us before and say that I need to have this? It was the Cabrera report, correct? The Cabrera report was at the top of the list, but also the evidence of using the criminal investigative process. I understand. I said two things. Also the collusion with the Ecuadorian government to pressure the court. Any other abuses that they committed by tendering evidence that turned out to be fabricated. It's not just Cabrera, it's Kambacher. There are other experts admitting in the crude outtakes that they didn't have the evidence of groundwater and other contamination, yet they've put in reports to the court in Ecuador as if they did have such evidence. We believe that Judge Du Bois got it absolutely right in the sense that this was an extraordinary waiver. This was an extraordinary disclosure. I'm going to give you 60 seconds to answer this question. You're writing an opinion. Normally you have to have a fairness test, which is a balancing test, and Westinghouse acknowledges that, all the courts seem to say that. Judge Du Bois decided he didn't have to do that here. When is it, forgetting this case, you're writing this opinion, that you can say one can forego a fairness test? When, on the basis of record before the court, it is obvious that this waiver was done to gain a litigation advantage and where the scope of the waiver was truly extraordinary, that dictates the result of the fairness balancing test. It is unfair under those circumstances, evident that it's unfair and doesn't require any further balancing. Here you have those elements absolutely met. It was an extraordinary waiver involving hundreds of hours of outtakes and the ones specifically before the court showing lawyers and experts engaging in blatant misconduct. And that's what court after court in this country has found in viewing the very outtakes that are before this court and were before Judge Du Bois. And it was truly done without question because they say it in their own brief, A1347, a furtherance of tactical litigation strategy. Their words. Judge Du Bois, under those circumstances, because it was to gain a tactical litigation advantage, whether they gained it or not, it was to gain it. Make no mistake about it, they admitted it to Judge Du Bois and it was hundreds of hours of extraordinary disclosures showing them engaging in improper conduct. Under those circumstances, Judge Du Bois effectively did the fairness balancing that Westinghouse and Teleglobe speak to because you couldn't find anything other than it was unfair. And, Your Honor, it's just one last thing. At this point, let's hear from Mr. Chris and Mr. Riero. All right, Your Honor, but it is still very much an urgent matter. And we told you it was urgent when we came here the first time. A judgment came days later, and it's still very much urgent to protect Chevron's interest against a travesty of justice and a multi-billion dollar judgment and these individuals facing criminal jeopardy. Thank you, Your Honors. Your Honors, good afternoon. I'm Drace Rivero for Rodrigo Perez. Yeah, I was going to say, we keep saying Peyeris, but his real name, it goes by Perez, that's what I thought. Yeah, that's right. It's Perez Peyeris, but he goes by Perez. That's how it's done in Spanish. So the other one wouldn't be Viega, but it would be Reyes. Actually, the Brazilians have a different naming order, Judge, but he does go by Viega. I don't want to spend my time on the nomenclature. East Portuguese, okay. What I really ask the Court to focus on is we're here on a 1782 discovery request, and the court question is a judge's discretionary decision in relation to a discovery request. Before I get to that in this brief time, there was one development that Mr. Tyrell did not allude to in this rush of events that have happened. Last Wednesday, February 15, the government of Ecuador set, or the judge in Ecuador set the preliminary hearing as to my client for March 2nd, which would be next Wednesday. If you all remember, when I was here on January 5th, I urged the Court that the time issue as to my client was extremely critical. In fact, we got it last week. We made a 28-day notice to the Court. The Court had already set this hearing. Of course, it would be impossible to move that forward more quickly. That critical juncture, we discussed this last time and I'll rely on my statements last time, that critical juncture of the criminal proceeding against my client happens next Wednesday. Now, we still have a need after that, even after the time, even if it's adverse to us, because there is a trial. But events are rushing to the disadvantage of my client. This request was served on November 16th. Judge Du Bois entered, in our view, a carefully considered decision. I want to point out we do stand in a slightly different position. We have only had 8 of these 1782s. We have no civil litigation. There is no judgment yet determined in our case. We do have clearly a foreign proceeding. We have a need of the evidence to defend. And the Cabrera Report, in particular, is cited various times in the equivalent of an information against my client. The very report that is at the heart of these requests. We need that discovery to defend him. The issue then becomes a question of Judge Du Bois' discretion. And Judge Amber, I'm very aware of the question you've posed. But my understanding is Judge Du Bois is one of the most experienced judges here in the Eastern District of Pennsylvania and that he's well respected. We're talking about his application of discretion on discovery questions. His use of that language, I would suggest first, Your Honors, does not determine the final issue. Even if he said that, one could consider that the evidence before he permitted him to make the balancing. But if one takes those words, he could be determined to be right for the reasons both of the standard and right for the wrong reasons. Simply put, when Mr. Mastro tells you, so Judge, this is going directly to your question. First of all, I consider that the fairness balance that Judge Du Bois, despite what he said, could have conducted this fairness balancing. If he did not, in what circumstances would there be an exception? And Judge, very clearly, it's where a counsel to advance the interest of his case, which is plainly what Mr. Donziger and these other lawyers did, takes on and both in the movie, the actual movie published, has published to the world his preparation of a witness or client's statements to a board meeting. One of the most sensitive kinds of client-to-client relationships is shown in the movie itself. And then when you go into the outtakes, including the outtakes shown to Judge Du Bois, there are considerations of different subject matters. There are discussions of different subject matters, whether, for example, there should be a false tax allegation. This is one of the clips made against my client to advance the interests of the plaintiffs in putting pressure on Chevron. I think we have this extraordinary set of facts shown. And I think the powerful thing that Judge Du Bois saw was he saw it on video. I think I've taken up my time. Let me ask you just one question. Maybe Mr. Chris can answer it. You've got one of the outtakes or portions of the film. There's a conversation between Cohn and Donziger discussing the possibility of criminal charges against your client and his client. What about the argument that the Republic of Ecuador makes that any communications that we have with Cohn or his colleagues should not be part of that because we're part of a community of interest and we haven't agreed that those particular communications should be made public or turned over? I addressed this previously in the Southern District of New York. I know of no conceivable set of circumstances where a common interest could be claimed between a government using its prosecutorial function with a private party. If, for example, in our context, if there were such communications and there were evidence that was exculpatory, which is what we're seeking, Brady would require the production of the statements from a cooperating witness, for example, or a cooperating individual. So the claim of common interest in regard to a criminal prosecution, I can't think of any circumstance where that interest could be claimed in relation to a criminal prosecution. The government is supposed to be exercising that function, as we understand it, under their laws, independently and neutrally for the cause of justice to point us from the outtakes of trying to advance a commercial interest. And I don't think, frankly, Judge, I don't think that the government of Ecuador has advanced that argument in relation to us. But if they are, I simply think there can't be a common interest, a shared proper legal interest in that regard. Let me just read you one at A1177. This is one of the documents that you request from Mr. Cohn. All documents relating to any work by Cohn, KSG, or by any plaintiff-affiliated person provided directly or indirectly to the government of Ecuador and all communications relating to such documents. Yes, Your Honor, if the question... Now, isn't that way beyond the charges that your client is facing? Judge, I may have misheard it. I just heard it orally. If it's as to documents provided by the plaintiff in relation to the criminal case against my clients. It just says document. A document isn't limited to the documents in the criminal case. That's just one. I just picked out one request. Your Honor, in discovery, again, first of all, in these scope questions, I think that's really where a trial judge has to exercise his discretion. As a litigating lawyer, you make a request and within that would fall all of what I'm looking for, which is documents related to advancing the criminal case against my client. I understand what you're saying. That, I think, would be really within the sweet spot of the judge's discretion on scope questions of that kind. I just think that would be determinable. I can just say one further thing. I just want to point out that Mr. Come, who was one of the principal lawyers for the plaintiffs, himself, and this is at A1565, stated to plaintiff's representatives the attorney-client privilege has been effectively destroyed due to Donziger's egotistical and naive behavior in allowing filming of what should have been confidential meetings. Now, I note that that is a lawyer who has represented the plaintiffs, who I think is known by reputation to be very experienced in this legal community, and I think that Judge Du Bois as well understood, based with his long experience, that same idea, that this kind of grandstanding publicly would destroy the privilege. Thank you for your time. Mr. Chris. Good afternoon, Your Honors. My name is Jason Chris from Covington and Burling on behalf of Ricardo Rice Vega. Mr. Vega, like Mr. Rivera's client, Mr. Perez, faces a preliminary hearing on these unfounded criminal charges in Ecuador a week from tomorrow. Obviously, there's a great need for discovery from Cone and KSG for that hearing, and we would respectfully request that you allow that discovery to go forward by lifting the stay or with a merits decision. But to be clear, even after that date passes, if there is no decision by this court, and we appreciate the great care that you've taken here, there still will be a pressing need because a trial date, assuming that the case is set for trial after the preliminary hearing, could come in a matter of two or three months. I wanted to address some of Judge Fisher's No, it's a non-jury trial, Judge Greenberg. I wanted to address some of Judge Fisher's concerns about scope of discovery and I think a useful backdrop here is that there's no evidence of a single direct client communication here in any of these materials. None of the 47 individuals that Mr. Terrell purports to represent. What you do have, if you look at the subpoena that Mr. Perez and Mr. Vega submitted to the district court, is not 172 requests, Judge Fisher. It's 20 requests directly relating to the criminal case, collusion with the government of Ecuador, and the Cabrera report fraud. The Cabrera report is cited in the charging instrument pending against Mr. Vega and Mr. Perez. Other evidence of expert witness collusion and improprieties in the Lago Agrio civil case, which has been incorporated into the criminal case, and some other requests relating to communications with other plaintiffs' team members or Cohen's role and KSG's role as the funder of this whole enterprise. The proposed narrowing that Mr. Terrell referred to in the first brief is inappropriate for a number of reasons. First, it's based on one decision by a magistrate judge in the District of Massachusetts in the case of Cristobal Bonifaz. Mr. Bonifaz was fired as lawyer for the plaintiffs well before the criminal investigation against our clients was reopened. And at the time that the magistrate judge made that decision, he, Mr. Bonifaz, had already submitted a statement to the court saying he didn't know anything about the Cabrera report fraud, which actually postdated his firing as counsel to the plaintiffs. So the Bonifaz situation really is completely in opposite to Mr. Cohen's situation, where as we cited in our brief, you know, Steven was a central player, he was the funder, there were extensive communications with the experts or so-called experts who were involved in the Cabrera report fraud, was intimately involved in communications with Steven Donziger, the ringleader of this whole scheme. Moreover, the proposed limitation, it's not just a matter Judge Amber, I believe you were the one who asked this question when it comes to the criminal case of contacts with the criminal case. Because what you also, for example, have is abundant evidence of scheming among the plaintiffs' lawyers and other team members to pressure prosecutors in Ecuador to, you know, try to get the criminal case reopened in the face of multiple decisions closing it. So it's not simply the communications I thought there was only one decision closing it. Did you say there's multiple decisions? Yes, there were multiple prosecutors. There were two sort of, the criminal investigation in Ecuador was proceeding on two separate tracks. One was effectively a fraud investigation and the other was an environmental crime case and what happened was that multiple prosecutors determined that there was no evidence of criminal liability in either of those two proceedings. What happens, however, is that on the heels of President Correa being inaugurated in January 2007, the prosecutor general is sacked, is replaced with a college friend of President Correa's who then reopens the investigation. Ironically, this prosecutor general when he was, you know, a lower level prosecutor was one of those prosecutors who determined that there was no evidence of a crime. But in the face of pressure instigated by the plaintiffs and political pressure, our clients now are facing this situation where they are defendants in a criminal case that we believe is based on fraudulent evidence, was brought for the purposes of extorting Chevron and as an attempt to vitiate this 1998 release, after all, the initial criminal complaint is filed on the heels of Chevron asserting that release as a defense. This pattern of things occurring on the heels of development, things occurring in the criminal case on the heels of the civil litigation continues most recently with the fact that you have judgment entered in the LaGuardia litigation and then lo and behold a notice for the preliminary hearing March 2nd in Quito. Thank you. Good afternoon, Your Honors. May I please report, my name is Patricia Hamill from the law firm of Conrad O'Brien and I represent Cone, Swift and Graf and Joseph Cone. As Your Honors are aware, and I will be brief in my comment, Mr. Cone's position here is really in the nature of interpleader. Mr. Cone has documents and information that the Chevron and the individual applicants in the 1782 action seek and from the very beginning what Mr. Cone has strived to do is twofold. One is protect his reputation because he's done nothing wrong here, but he also takes very seriously that there are privileges and confidences that may have attached to the documents in his file and taking those very seriously, he prepared an 833 page privilege log of all of the documents in his files, took a very broad approach to privilege because he takes it very seriously and does believe that privileges should be protected unless a court, Your Honors, or Judge Du Bois should determine that privileges have been waived. In the filming, how many hours were of filming involved, Mr. Cone? Our understanding is we don't have all of the outtakes, but it's about 200 hours out of the five to six hundred and if you, I'm sorry, two hours out of the five to six hundred. Thank you, Judge Fisher. And as far as the crew documentary itself, it's less than two minutes. There were two occasions of filming, one in June of 2006 and one in January of 2007. And in that filming, in addition to the one thing I noted to Mr. Chris, that there was a discussion that took place between Donziger and Cone pertaining to the prosecutions of Perez and Vallega, what else did those two hours deal with? As far as the outtakes, there's some discussion of legal budgeting. There's an interview with Mr. Cone that was actually a snippet was quoted in the Wall Street Journal in an op-ed about why he took on such a case. It's very general sorts of topics like that. I've not viewed the outtakes because we do not have access to them, but that's my understanding from reading the public record. So I stand here today if you have any questions, but otherwise we're prepared. Obviously the stay's in place and we're continuing to hold the documents and we'll abide by whatever this court's decision is or if it gets remanded to Judge Du Bois to obviously participate in that proceeding as well. Thank you. Anything else? Thank you. I'd like to begin by responding to Mr. Rivero's discussion about common interest. Why don't you go first and then I'll go. The common interest doctrine as it might apply to a criminal prosecution. He's right, of course, that there is very little authority, very few examples of the situation in which a prosecutor invokes the common interest doctrine as to a prosecution, but this is a very unusual situation. What I hear being said, in effect, is how can the Republic of Ecuador say that there's a community of interest that it has with the plaintiffs when the plaintiffs have a civil suit and the Republic of Ecuador has a criminal action going on. That can't be a community that can't be, forget identical, it doesn't seem to be a similar interest. And we're not claiming a community of interest as to the prosecution in Ecuador. Our community of interest, to the extent it might apply to the criminal prosecution, has to do with our ability to respond in the international arbitration to Chevron's efforts to impugn the Ecuadorian judiciary on the basis of that criminal prosecution. And that's why, in principle... But the plaintiffs have no interest whatsoever in that criminal prosecution, do they? No. At least no legitimate interest. So if you do and they don't, how are your interests similar? Because we both have an interest in protecting the integrity of the Ecuadorian judiciary. And one of Chevron's attacks on the integrity of the Ecuadorian judiciary is to try to draw into question the legitimacy of this criminal prosecution. That's an issue that they have raised in the international arbitration. They're litigating it right now. And that's why we have a common interest with the plaintiffs with regard to that issue. But it's Chevron that created the common interest. Also, in some regards... Chevron created the common interest? Chevron did create the common interest by dragging the Republic of Ecuador into the civil litigation. But what's that got to do with Perez and Vallega? Only because Chevron is making an issue of Perez and Vallega in the international arbitration. And using Perez and Vallega as a way of claiming that the Ecuadorian government and the Ecuadorian judicial system can't be trusted. And that's the reason for it. But in fact, if you look at the documents, and I realize the court doesn't have the benefit of the privilege law, but none of the documents that we seek to protect here actually involve this issue. So in the end, it's not something that the court likely needs to decide. The document that Your Honor mentioned earlier involving Cohn and Donziger doesn't involve any representative of the Republic of Ecuador. And we are aware of no documents that deal with the criminal prosecution. In principle, of course, if Ecuador wanted to question Mr. Cohn about his contacts with Ecuador during a deposition, then we think we would have a legitimate basis for objecting to that under the common interest doctrine. But as of right now, there is no live issue as far as the Republic is concerned with regard to the criminal prosecution. And if I may, let me finally respond to Judge Greenberg's question about whether there's evidence that anything that has been submitted to the Court of Arbitration regarding Cohn and Donziger  evidence-based indictment.  to respond to that question. Thank you.